UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GARY PEARSON, | ) | |
| | ) | |
| Plaintiff, | ) | 15 C 653 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| ILLINOIS BELL TELEPHONE COMPANY and | ) | |
| MICHAEL WILEY, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Gary Pearson alleges that Illinois Bell Telephone Company, his former employer, and

Michael Wiley, his former supervisor, discriminated against him on the basis of race in violation

of 42 U.S.C. § 1981 when they fired him from his job as a service technician. Doc. 9. With

discovery closed and jury trial set for February 23, 2016, Doc. 59, Defendants have moved for

summary judgment, Doc. 51. The motion is denied.

**Background**

The following facts are set forth as favorably to Pearson as the record and Local Rule

56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment,

the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo*

*Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

Illinois Bell sells AT&T-branded telephone, internet, and television services to Illinois

consumers. Doc. 62 at ¶ 1. Pearson, who is African-American, worked for Illinois Bell as a

customer service technician from 1990 until his firing in January 2013. *Id*. at ¶ 2; Doc. 66 at ¶ 1.

In 2010, Pearson began working out of Illinois Bell's Hastings Garage. Doc. 62 at ¶ 7; Doc. 63

at 5; Doc. 66 at ¶ 4. Pearson's direct supervisors there were Rudy Hicks and later, starting in

April 2012, Sandra Jackson.  Doc. 62 at ¶¶ 8-9; Doc. 66 at ¶ 4.  Wiley, to whom Hicks and

Jackson reported, was his second-level manager.  Doc. 62 at ¶ 3; Doc. 66 at ¶ 4.  Both Hicks and

Jackson are African-American, while Wiley is white.  Doc. 62 at ¶ 10; Doc. 66 at ¶ 4.

Due to the consumer-facing nature of his work, among Pearson's job criteria were

punctuality and dependability, including reporting to work on time each morning.  Doc. 62 at

¶¶ 14-15.  To enforce those expectations, Illinois Bell had a progressive system of discipline for

attendance issues.  *Id*. at ¶¶ 18-19; Doc. 66 at ¶ 8.  Under that system, each successive attendance

violation within a year of the previous violation triggered increasingly stiff penalties: verbal

warnings, then written warnings, then suspensions of increasing lengths, and, eventually,

termination.  Doc. 66 at ¶ 8.  Wiley testified that the progression began with "verbal warnings"

and "written warnings," and then was followed by a "one day suspension, three day suspension,

five day suspension, ten day suspension, suspension pending termination and termination."  Doc.

63-5 at 6.  Both single tardy arrivals and absences from work of any length (including multiple-

day absences) qualified as single attendance violations.  Doc. 66 at ¶ 10.  Although first-level

supervisors like Hicks and Jackson directly administered the discipline, Wiley was involved not

only with setting attendance policies but also with any discipline issued above the level of a

warning.  Doc. 54-1 at 11, p. 64; Doc. 63-2 at 9.

Pearson's workday at the Hastings Garage was 8:00 a.m. to 4:30 p.m.  Doc. 62 at ¶ 7.

Illinois Bell expected its technicians to report to work on time for a mandatory morning meeting

in the crew room.  Doc. 54-3 at 3, p. 11; Doc. 62 at ¶¶ 17, 31.  Technicians who arrived by 8:05

were not considered tardy, while technicians who arrived after 8:10 were.  Doc. 62 at ¶ 31; Doc.

66 at ¶ 25.  The parties disagree over how management treated tardiness of between five and ten

minutes.  Doc. 66 at ¶ 25.  Because Wiley testified in his deposition that a technician would be

considered tardy only "after probably ten minutes late, somewhere in there," Doc. 63-5 at 7, this dispute is resolved in Pearson's favor for summary judgment purposes: only lateness of ten minutes or more made a technician officially "tardy" and thus potentially subject to discipline. Technicians could be late approximately three times before supervisors would begin to record their tardies in the progressive discipline database. Doc. 62 at ¶ 31.

When Pearson began working at the Hastings Garage, his record contained only a single instance of attendance-related discipline: a verbal warning for missing work on Sept. 21, 2009. *Id*. at ¶ 26; Doc. 66 at ¶ 10. Before 2009, he had maintained a spotless disciplinary record for nearly twenty years. Doc. 63-2 at 5; Doc. 66 at ¶ 6. But Pearson began to accumulate a formidable disciplinary record at Hastings. Hicks verbally warned Pearson for being absent from June 4 to June 10, 2010, and then verbally warned him again for being absent from August 9 to August 13, 2010. Doc. 62 at ¶¶ 27-28. Hicks next issued Pearson a "first written warning"—the next rung up the progressive discipline ladder—for being absent from February 3 to February 9, 2011. *Id*. at ¶ 29. Thereafter, Pearson was ten to fifteen minutes late reporting for duty on three days in May and June 2011, but—consistent with the above-mentioned policy of waiting until tardiness became recurrent to impose formal discipline—received only informal counseling on those occasions. *Id*. at ¶ 31. After Pearson was fifteen minutes late for work on July 14, 2011, he received a second "first written warning" from Hicks. *Id*. at ¶ 30. Pearson then received a third "first written warning" for being ten minutes late on November 1, 2011. *Id*. at ¶ 32.

Pearson was absent on November 29 and 30, 2011, prompting a "second written warning" and one-day suspension, which Hicks issued on December 21 and which Pearson served on December 23. *Id*. at ¶ 33. Pearson was absent again on January 19, 2012, leading Hicks to prepare a "final written warning" and three-day suspension. *Id*. at ¶ 34. Before the

suspension could be formally issued, however, Pearson took disability leave from February 7 until August 20, 2012. *Id*. at ¶¶ 34-35, 38. Most of that prolonged disability leave was later deemed an absence because it was not covered by the Family and Medical Leave Act. *Id*. at ¶ 39. When Pearson returned, he received the "final written warning" and three-day suspension, which covered both the January 19 absence and the February-to-August leave. *Id*. at ¶ 38.

Pearson nominally disputes certain aspects of the foregoing attendance history, relying exclusively on a technicality: some corroborating records were not signed by the manager who imposed the discipline. *Id*. at ¶¶ 26-29, 34, 51. But Pearson points to no contrary evidence (*i.e.*, evidence that he was present when the records assert he was absent or tardy, or evidence that he did not serve the suspensions in question), and the mere absence of a signature is no reason to ignore an employer's otherwise admissible records. *See Collins v. Am. Red Cross*, 715 F.3d 994, 999 (7th Cir. 2013) ("[W]e see no reason why a reasonable jury would reject a proposition supported by some, albeit imperfect, evidence in favor of a proposition supported by no evidence at all."). The foregoing attendance history is therefore taken as accurate.

Between 2010 and 2012, Pearson also served several suspensions for falling short of performance expectations, for which there was a progressive discipline track separate from the track for attendance issues. Doc. 62 at ¶ 36. For example, Pearson was suspended for taking a customer's DSL out of service unnecessarily (although Pearson denies that he did so). *Ibid*. Pearson received his fifth and final performance-related suspension in November 2012, when Jackson issued a ten-day suspension for failing to check an F1 terminal before performing service and for failing to seek help from a manager when he could not access a customer's residence. *Id*. at ¶ 40. (Pearson again believed the suspension was unwarranted, this time because he did not think checking the terminal was necessary. *Ibid*.) The parties disagree over

what exactly transpired between Jackson and Pearson when Jackson announced this suspension. *Id*. at ¶¶ 43-48. For the purposes of resolving this motion, the court credits Pearson's testimony where it diverges from Jackson's.

On November 27, the day Jackson issued the suspension, Jackson met in person with Pearson and a union steward, Lawrence Payne, to announce her decision and discuss the performance issues that precipitated it. *Id*. at ¶ 42; Doc. 63-1 at 10, p. 125. It is undisputed that Pearson was to serve the suspension beginning the week of December 3, that Jackson gave him those dates in writing at the meeting, and that she at least attempted to inform him of those dates verbally as well. Doc. 62 at ¶¶ 42, 45; Doc. 63-1 at 10, p. 125. Pearson, however, was "irate" upon learning of the suspension. Doc. 63-1 at 10-11, pp. 125-26. Presumably because of his anger, Pearson does not recall many details of the meeting, including what, if anything, he was told about the dates of the suspension; Jackson testified that Pearson cut her off when she tried to explain them, saying he knew the dates were in the letter. Doc. 54-4 at ¶ 14; Doc. 63-1 at 10-11, p. 125-28. For whatever reason, Pearson did not get the message, and he left the meeting under the misimpression that his suspension was to begin the next day. Doc. 63-1 at ¶ 11, p. 129.

The next morning, November 28, Pearson did not report to work at the beginning of his shift. *Ibid*. Payne called Pearson, informed him of his error, and told him that Jackson was looking for him. Doc. 62 at ¶ 47. Pearson then called Jackson, explained his mistake, and asked if he could take a vacation day to cover his absence. Doc. 63-1 at 12, p. 132. Jackson replied that she would see what she could do, and instructed Pearson to come in "and we'll work something out." *Ibid*. Pearson reported for work ninety minutes late. Doc. 62 at ¶ 49.

Upon being informed of Pearson's latest tardy arrival and after consulting with several other managers, Wiley suspended him pending termination, the next stage of progressive

discipline.  Doc. 54-4 at ¶ 16; Doc. 62 at ¶¶ 50-51.  The notice cited his history of attendance problems, with his late arrival on November 28 being the final straw.  Doc. 62 at ¶ 51.  Upon further review, Wiley terminated Pearson on January 24, 2013.  *Id*. at ¶¶ 52-55.  The stated basis for the decision was Pearson's track record of attendance violations, culminating in the November 28 incident; his performance-related disciplinary history was not a factor.  *Id*. at ¶ 51.

Pearson does not deny that he accumulated the extensive list of attendance-based discipline described above, the existence of which transformed his late arrival on November 28 into a fireable offense.  Doc. 61 at 6.  Rather, Pearson believes his disciplinary record does not tell the whole story; he contends that Wiley bore a racially motivated grudge against him and, as a result, singled him out by enforcing attendance rules more strictly against him than against non-African-American employees.  *Id*. at 5-7; Doc. 63 at ¶ 6.

Wiley exhibited animosity toward Pearson in discussions with David Christ, a union steward in the Hastings Garage.  As one of the garage's longest-tenured employees and most experienced stewards, Christ had a close relationship with management, including a personal rapport with Wiley.  Doc. 63-2 at 24; Doc. 66 at ¶ 5.  Based on his conversations with Wiley about Pearson, Christ believed that Wiley didn't like Pearson and "had a grudge" against him.  Doc. 63-2 at 21, 23.  Certain remarks fed that impression; for instance, Wiley accused Pearson of malingering and told Christ that "he doesn't think [Pearson]'s a good worker."  *Id*. at 23-24.

Defendants, believing these remarks to be the *only* basis for Christ's impression that Wiley disliked Pearson, argue that Christ was merely speculating and that his testimony regarding Wiley's overall attitude toward Pearson should be disregarded.  Doc. 64 at 8.  Christ's testimony is somewhat garbled on this point: "Q. And what is that opinion based on?  A. … [A] few comments when he talked to me, you know, as—our conversations and I just—when that—

when Mike Wiley got—I want to word it the right way. When he kind of didn't like somebody, he kind of held onto a grudge kind of thing." Doc. 63-2 at 21. But given Christ's close relationship with Wiley, it is reasonable to infer from his answer that he permissibly based his testimony about Wiley disliking Pearson on both Wiley's comments and direct observation of Wiley's demeanor.

None of Wiley's critical remarks about Pearson mentioned race. Doc. 62 at ¶ 67. The only racially tinged remarks any supervisor made to Pearson came from Hicks (who, as noted, is African-American), who occasionally told him that his "black ass better start doing this right." *Id*. at ¶¶ 67-69. Still, Wiley had on one previous occasion singled out a non-white employee for excessive discipline, according to Christ; the employee in question, Joseph Akers, was in Christ's words "mixed between black and Spanish." Doc. 63-2 at 21-22. After an incident in which Akers could not find a customer line, Wiley told Christ that Akers was "just lazy and didn't want to do it." *Id*. at 22. Christ characterized Akers as "a very good technician" but said that after Wiley made the "lazy" remark, Akers "started getting on all the discipline." *Ibid*.

Pearson offers the testimony of Christ and Payne to show that he was singled out for unusually harsh treatment. Both men worked alongside Pearson in the Hastings Garage and, by dint of their union steward positions, were familiar with Illinois Bell's disciplinary rules and practices. Doc. 63-3 at 3-5; Doc. 66 at ¶ 3. Defendants dispute much of Christ's and Payne's testimony by quibbling over whether they have personal knowledge of matters about which they testified. Doc. 64 at 2; Doc. 66 at ¶¶ 6-7, 12-17, 22. Where those objections have merit, the court has disregarded the testimony. But as union stewards, Christ and Payne could reasonably be expected to have direct knowledge of disciplinary matters. It was, as they explained, their job to keep abreast of disciplinary practices, which required them to be familiar with the track

records of Hastings Garage employees. Doc. 63-2 at 3-4; Doc. 63-3 at 4-5; Doc. 66 at ¶ 3;

*compare Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) (rejecting

testimony about disciplinary matters for lack of personal knowledge where the witness "d[id] not

explain *how* she possibly could possess personal knowledge" of information usually "kept

between the employee and the supervisor"). To the extent Christ or Payne testified in

generalities or failed to definitively say that certain discipline did not occur, that is

understandable given that they were testifying about fairly routine day-to-day affairs of the shop

that transpired years ago. *See Johnson v. Cook Inc.*, 327 F. App'x 661, 664 (7th Cir. 2009)

(holding that a human resources manager who reviewed thousands of applications "had personal

knowledge of the events leading to [plaintiff's] elimination from consideration, even if he did not

later recall what he knew" about the specific application in question). Christ and Payne are also

entitled to fill in some gaps by drawing reasonable inferences about what likely occurred, based

on their recollection or lack of recollection of particular discipline being imposed. *See Ani-Deng*

*v. Jeffboat, LLC*, 777 F.3d 452, 454 (7th Cir. 2015) ("[P]ersonal knowledge can include

inferences—most of our personal knowledge is inferential.") (citation omitted).

According to Christ, "most of" the non-African-American technicians at the Hastings

Garage were treated "more favorably than" Pearson when it came to tardiness. Doc. 63-2 at 8.

Because morning meetings took place in one large room at the garage, everyone present was able

to observe others' arrival times. Doc. 63-4 at 4. That was especially true of Christ, who was

invariably punctual. Doc. 63-2 at 19. According to Christ, some technicians were "habitually"

late. *Id*. at 18. Two such offenders were Alex Macines and Greg Harris, whom Christ described

as "Spanish"—meaning Hispanic, *id*. at 7—and "African"—meaning African-American—

respectively. *Id*. at 18. Christ never saw Macines or Harris called into a disciplinary meeting,

and nor to his knowledge did they otherwise face discipline for their tardiness.  *Id*. at 19.  Christ also named three white technicians who received "more favorable" treatment than Pearson when they were late—Scott Feck, Keith Galinski, and Ann Bata—although he did not elaborate on their attendance habits or what discipline, if any, they received.  *Id*. at 7-8.; Doc. 66 at ¶ 7.

Defendants question whether Christ had adequate foundation to make a meaningful comparison of Pearson's disciplinary history to Feck's, Galinski's, and/or Bata's.  Doc. 64 at 4. But because Christ had the opportunity to observe their arrivals and, as a union steward, would have been obliged to keep abreast of disciplinary matters at the garage, he has sufficient personal knowledge to render his testimony admissible.  *See Trs. of the Chi. Painters and Decorators Pension Fund v. John Kny Painting and Decorating, Inc.*, 2016 WL 406328, at *5 (N.D. Ill. Feb. 3, 2016) ("The fact that none of these witnesses can recall the specifics of these conversations might affect the weight to be given to their testimony, but it does not affect the admissibility of the testimony."); *Ross v. Baldwin Cnty. Bd. of Educ.*, 2008 WL 2020470, at *6 n.7 (S.D. Ala. May 9, 2008) (holding that "inability to recall specifics goes to the weight which the jury may wish to afford the testimony, not to its admissibility"); *McFarlane v. Esquire Magazine*, 1994 WL 510088, at *9 (D.D.C. June 8, 1994) ("Lack of specificity goes to weight and not to admissibility.").

According to Payne, while Pearson was regularly "pulled into a meeting" when tardy, others "were able to continue about their day" (although Payne could not recall specific comparators who received lenient treatment).  Doc. 63-3 at 8-9.  Payne believed Wiley was the driving force behind management's differential treatment of Pearson.  *Id*. at 10-11.  In his experience, initial disciplinary decisions made in consultation with Pearson and Payne by Hicks, the first-level supervisor, were frequently overturned in favor of harsher punishment the next

day, after Hicks would have spoken to Wiley. *Ibid*. When suspending Pearson in August 2012, Jackson also said it was "over [her] head" and pointed to Wiley's office. Doc. 66 at ¶ 26.

Pearson also was never allowed to use vacation days to avoid discipline when he was late or absent, including—most crucially—on November 28, 2011, when he arrived ninety minutes late. *Id*. at ¶¶ 13, 32. Here, too, Wiley was the apparent driver of the refusal to heed Pearson's requests, as Hicks routinely told Pearson that the denials were "over his head." Doc 63-1 at 16, pp. 187-88; Doc. 66 at ¶ 32. By contrast, as Christ and Payne testified, a white employee who had extensive prior attendance problems of his own, Sam Braun, was allowed to take a vacation day rather than face further discipline when he "was suspended and he goofed up on his days." Doc. 63-2 at 11-12, 25-26; Doc. 63-3 at 20; Doc. 66 at ¶ 13. Braun's attendance record was similar but not identical to Pearson's, consisting of "a lot of disability, a couple of tardies, illnesses, incidentals." Doc. 63-3 at 20. Like Pearson, Braun was supervised at the second level by Wiley. *Id*. at 20; Doc. 66 at ¶ 13. Christ also was sometimes allowed to take a vacation day on the spot if, for example, he had car trouble on his way to work. Doc. 63-2 at 20.

Apart from attendance-related issues, there were other ways in which Pearson appears to have been treated more harshly than others. Hicks singled Pearson out for criticism at team meetings. Doc. 63-3 at 9-10. In addition, Illinois Bell enforced rules against receiving overtime and other benefits while on light duty "tightly" against Pearson. Doc. 63-2 at 12. By contrast, when Bata (one of the white employees who received "more favorable" treatment, according to Christ) was hurt, she received overtime assignments. *Ibid*. Similarly, Pearson was required to report to the central office while on disability, while another technician, John Bordenaro, was permitted to remain at the garage and "just sit in the office." *Id*. at 13-14. Pearson was also sent to service DSL connections without first receiving training on how to do so, while most non-

10

African American technicians who were sent to perform those jobs received the training. Doc. 63-2 at 14-15. Finally, as to the time Pearson received performance-based discipline for failing to check an F1 terminal and for his issues accessing a customer's residence, two Hispanic technicians unsuccessful in completing the same assignment were not disciplined. Doc. 63-3 at 8; Doc. 66 at ¶ 22.

## Discussion

Pearson alleges that his firing was discriminatory because he accumulated attendance-based progressive discipline more rapidly than a similarly situated non-African-American employee would have, transforming his lateness on November 28, 2011 into a fireable offense. Doc. 61 at 6-7. Although Pearson brings his claim under § 1981 and not Title VII, "[t]he same requirements for proving discrimination apply to claims under Title VII [and] § 1981." *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010); *see also Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) ("[T]he methods of proof and elements of a Section 1981 case are essentially identical to those in a Title VII case.") (internal quotation marks and alteration omitted). So the court will cite Title VII precedents in addressing Pearson's § 1981 claim.

Until recently, plaintiffs in the Seventh Circuit could avoid summary judgment in employment discrimination cases by making one of two showings. *See*, *e.g.*, *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016); *Carothers v. Cnty. of Cook*, 808 F.3d 1140, 1148-49 (7th Cir. 2015). First, a plaintiff could attempt to satisfy the so-called "direct method" of proof; under that method, the court would evaluate whether the plaintiff had "present[ed] sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Harper v. Fulton Cnty.*, 748 F.3d 761, 765 (7th Cir. 2014); *see*

*also Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Second, a plaintiff could avoid summary judgment by satisfying the so-called "indirect method" of proof. Set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the indirect method allows the plaintiff to shift to the defendant the burden of proof on the question of intent once the plaintiff makes certain showings. *See id*. at 802. Specifically, the plaintiff first has to make a *prima facie* case, "showing that (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016) (internal quotation marks omitted). If the plaintiff makes her *prima facie* case, the burden shifts to the defendant to give a non-discriminatory reason for treating the plaintiff the way it did, and if the defendant meets *its* burden, the burden shifts back to the plaintiff to show that the defendant's explanation was just a pretext. *See McDonnell Douglas*, 411 U.S. at 802, 804.

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit eliminated the distinction between the direct and indirect methods, stating that "[t]he time has come to jettison these diversions and refocus analysis on the substantive legal issue." *Id*. at 764. The substantive legal issue in *Ortiz* was "[w]hether a reasonable juror could conclude that Ortiz would have kept his job if he had a different ethnicity, and everything else had remained the same." *Ibid*. The district court appeared to have considered some evidence under the direct method but not under the indirect method, and vice versa, *id*. at 763, and the Seventh Circuit held that to be reversible error, *id*. at 767. In the process, the Seventh Circuit explicitly overruled numerous decisions "to the extent that these opinions insist on the use of the direct-and-indirect framework." *Id*. at 765-66. *Ortiz* also explicitly overruled precedents that instructed district

courts to determine under the direct method whether the plaintiff had presented a "convincing mosaic" of circumstantial evidence. *Id.* at 764-65. *Ortiz* makes clear, though, that it does not undermine "the burden-shifting framework created by *McDonnell Douglas*," explaining:

> Today's decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand. We are instead concerned about the proposition that evidence must be sorted into different piles, labeled "direct" and "indirect," that are evaluated differently. Instead, all evidence belongs in a single pile and must be evaluated as a whole. That conclusion is consistent with *McDonnell Douglas* and its successors.

*Id.* at 766.

To survive summary judgment, then, a plaintiff must present evidence that, considered as a whole, would allow a reasonable juror to conclude that she was discriminated against due to a protected characteristic, suffering an adverse employment action as a result. *See Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 899 (7th Cir. 2016). *McDonnell Douglas* identifies one pattern that the evidence might fit that would enable a reasonable juror to find discrimination— namely, a pattern of evidence showing that the plaintiff belonged to a protected class, met her employer's legitimate expectations, suffered an adverse employment action, and was similarly situated to other employees who were not members of the protected class and who were treated better, provided that the defendant fails to articulate a reasonable alternative explanation or the plaintiff shows that the proffered alternative explanation is a pretext. But the pattern identified in *McDonnell Douglas* is just one way that the record evidence could enable a reasonable juror to find discrimination. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that *McDonnell Douglas* is "a common, but not exclusive, method of establishing a triable issue of intentional discrimination"). A district court must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether "a reasonable factfinder [could] conclude that the plaintiff's

race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.

Accordingly, the court will first lay out every piece of (properly of-record) evidence that weighs either way on the question whether Pearson was terminated because he was African-American. The court will then see if the evidence, *considered as a whole*, fits the *McDonnell Douglas* pattern; if it does, then Pearson survives summary judgment. If the evidence does not fit the *McDonnell Douglas* pattern, then the court will step back and—again, *considering the evidence as a whole*—determine whether a reasonable factfinder could conclude that Pearson was discriminated against; if so, then Pearson survives summary judgment, and if not, then not. *See Cole*, 838 F.3d at 899; *Ortiz*, 834 F.3d at 765.

Here is the evidence weighing in favor of a finding that Pearson was fired because he was African-American. Prior to 2009 and before coming to the Hastings Garage, Pearson's record was devoid of any formal discipline. Doc. 63-2 at 5; Doc. 66 at ¶ 6. Once Pearson began to accumulate discipline, the tardies that counted against him were—with the exception of his final tardy on November 28—close calls, between ten and fifteen minutes late. Doc. 62 at ¶¶ 30-32; Doc. 63-5 at 7; Doc. 66 at ¶ 25. At least one non-African-American technician, Macines, was "habitually" late—making him a worse offender than Pearson—and Macines was never reprimanded or disciplined. Doc. 63-2 at 18-19. The union stewards who kept tabs on disciplinary matters noticed that other non-African-American employees, including Feck, Galinski, and Bata, were treated more leniently, too. *Id*. at 7-8; Doc. 63-3 at 8-9. And Pearson's request to take a vacation day when he was mistaken about his suspension dates was denied, even though the experience of Christ and Braun (who had chronic attendance problems of his

own) shows that non-African-American employees were at least sometimes afforded that opportunity.  Doc. 63-2 at 11-12, 20, 25-26; Doc. 63-3 at 20; Doc. 66 at ¶¶ 13, 32.

Pearson experienced other strict treatment as well.  He was singled out for criticism. Doc. 63-3 at 9-10.  Limitations associated with placement on disability were enforced against him, while certain non-African-American employees had more favorable experiences.  Doc. 63-2 at 12-14.  Pearson was denied necessary training that non-African-American technicians received.  *Id*. at 14-15.  And at least some of his performance-based discipline was not issued against non-African-American technicians who had similar problems on the same day.  Doc. 63-3 at 8; Doc. 66 at ¶ 22.  (With respect to that point, Defendants argue that the supporting testimony does not make clear whether the Hispanic technicians made all of the same errors as Pearson, or only some.  Doc. 64 at 6 (citing Doc. 66 at ¶ 22).  That is true.  But even granting that the testimony is imprecise, it is still relevant evidence, *see McFarlane*, 1994 WL 510088, at *9, and therefore must be considered under *Ortiz*, *see Williams v. Office of the Chief Judge of Cook Cnty.*, 839 F.3d 617, 626 (7th Cir. 2016) ("We must consider the evidence as a whole, rather than by asking whether any particular piece of evidence proves the case by itself.").) Although Pearson does not allege that any of this treatment was itself actionably discriminatory, Doc. 61 at 13, it is nevertheless evidence—on which a reasonable jury might (or might not) place weight—both that management had it in for Pearson and that race was the explanatory variable.

Finally, there is evidence that Wiley was unusually strict with Pearson because he harbored a grudge against him and questioned his work ethic.  Doc. 63-2 at 21, 23-24.  Wiley had held a similar grudge against another African-American employee, Akers, he viewed as "lazy."  *Id*. at 21-22.

Here is the evidence weighing against a finding that Pearson was fired because he was African-American. Illinois Bell's technicians needed to be punctual and dependable and to report on time to work. Doc. 62 at ¶¶ 14-15, 17, 31. Pearson was ten to fifteen minutes late to work five times in 2011. *Id*. at ¶¶ 30-32. He was absent on six different occasions while assigned to the Hastings Garage, often for multiple days in a row, and he took several months of disability leave that were later deemed improper. *Id*. at ¶¶ 27-29, 33-35, 38-39. He was also suspended several times for falling short of performance expectations. *Id*. at ¶¶ 36, 40. When informed of one such performance-based suspension, he responded angrily and walked away without listening to the dates he was to serve the suspension, causing him to be ninety minutes late to work the following day (the incident that precipitated his termination). Doc 54-4 at ¶ 14; Doc. 62 at ¶¶ 42-45, 49; Doc. 63-1 at 10-11, pp. 125-28. All of the forgoing warranted discipline under the company's stated attendance policies, and Defendants followed the progressive discipline plan in the sanctions it imposed, up to and including Pearson's firing. In the course of doing so, Defendants issued Pearson multiple "first written warnings" before progressing to a "second written warning." Doc. 62 at ¶¶ 29-30, 32.

Meanwhile, the only racial comment any supervisor made was Hicks's "black ass" comment, and there is no evidence that Wiley—the key decisionmaker—ever referred to Pearson's race. *Id*. at ¶¶ 67-69. Finally, not all of the employees who received more lenient treatment than Pearson were non-African-American. Harris's habitual lateness was treated with the same leniency as Macines's, and Harris was African-American. Doc. 63-2 at 18-19.

Starting with *McDonnell Douglas* and its first step, Pearson has made his *prima facie* case. The only elements of the *prima facie* case in dispute are the second, whether Pearson met Illinois Bell's legitimate performance expectations, and the fourth, whether he has identified any

similarly situated individuals outside the protected class who were treated better than he was. Defendants contend that Pearson's attendance history shows that he did not meet their legitimate expectations. Doc. 52 at 7-10. But where, as here, there is evidence "that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a *prima facie* case by establishing that similarly situated employees were treated more favorably." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 492 (7th Cir. 2014); *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013). To establish unequal treatment, Pearson "must identify a comparator who is directly comparable to [him] in all material respects … to eliminate other possible explanatory variables." *Williams*, 839 F.3d at 626 (ellipsis in original) (internal quotation marks omitted).

Courts "conduct a common-sense examination" of potential comparators, who "need not be identical in every conceivable way." *Perez*, 731 F.3d at 704 (internal quotation marks omitted); *see also Coleman*, 667 F.3d at 847 (noting that there is no "magic formula" for identifying relevant comparators and that "the similarly-situated inquiry should not devolve into a mechanical, one-to-one mapping between employees") (internal quotation marks omitted). In the usual case, it suffices that comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman*, 667 F.3d at 847 (internal quotation marks omitted); *see also Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir. 2008); *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 688 (7th Cir. 2007). "Ultimately, the crux of the issue is whether [the plaintiff's] and [the comparator's] misdeeds were 'sufficiently distinct' to

distinguish meaningfully between them at summary judgment, or whether a jury could reasonably find they were comparable." *Perez*, 731 F.3d at 705.

Pearson has identified such a comparator in Macines. If a jury credits Christ's testimony, it could conclude that Macines, by virtue of being "habitually" late, was at least as bad an attendance apple as Pearson, who was disciplined for arriving just outside the ten-minute grace period on five occasions over the course of a year. Unlike Pearson, Macines, who is not African-American, was apparently never disciplined. That difference in enforcement—strict for Pearson, nonexistent for Macines—is evidence that Pearson was being targeted because of his membership in a protected class. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 974 (7th Cir. 2012) (holding, in a Fair Labor Standards Act case, that an employer's progressively disciplining plaintiff "*every* time he missed a punch or punched in late" was evidence of retaliation when the same employee had been afforded leeway before he engaged in protected activity).

Defendants contend that the record does not definitively establish that Macines was never disciplined, suggesting that such discipline might have occurred "when Christ was not present." Doc. 64 at 5. But a jury could reasonably infer that Christ, an experienced union steward, would have been privy to any such discipline if it occurred, and Christ said he was scrupulously punctual on the days he worked. Defendants further object that Pearson has not provided sufficient detail about Macines's conduct and background to determine whether the two are similarly situated, believing that Christ's testimony that Macines was "habitually" late is too vague to make a meaningful comparison. *Ibid*. This argument, too, is unavailing. Whatever "habitual" lateness entails, Defendants have identified only six occasions on which Pearson reported late during his two final years of employment at the Hastings Garage, and—drawing

inferences in his favor—it is reasonable to infer from Christ's testimony that Macines was late far more often.

Contrary to Defendants' submission, *Stevenson v. United Airlines, Inc.*, 2015 WL 1977673 (N.D. Ill. May 1, 2015), does not support a different result. In *Stevenson*, an African-American plaintiff identified several non-African-American coworkers who he believed had committed similar offenses but were not similarly disciplined. *Id*. at *4. The alleged misconduct in that case—falsifying records in the tightly regulated environment of an international airport, *id*. at *1-2—triggered a nuanced multi-stage disciplinary process, *id*. at *2, in the course of which the plaintiff alleged he was treated unfairly, *id*. at *2-3. As to comparators about whose offenses or disciplinary proceedings the plaintiff provided no information other than the bare fact that they violated the same workplace rule, the court held that it was "impossible to evaluate whether these employees were similarly situated." *Id*. at *5. The court did not hold that every detail of a comparator's disciplinary history needs to be spelled out in every case. Pearson has provided enough information to answer the simpler questions that are relevant here: was Macines late at least as often as Pearson, and, if so, was he disciplined at all? Drawing reasonable inferences in Pearson's favor, the record answers those questions: yes, Macines was frequently late, and no, he was not disciplined.

That conclusion is in keeping with Seventh Circuit precedent, which teaches that Macines need not be a carbon copy of Pearson or have violated the rules in precisely the same way to serve as a valid comparator. *See Perez*, 731 F.3d at 704-05; *Coleman*, 667 F.3d at 851 ("Where a proposed comparator violated the same rule as the plaintiff in an equivalent or more serious manner, courts should not demand strict factual parallels."). This approach makes especially good sense where, as here, Pearson's firing was the culmination of a progressive system of

discipline. That makes it unimportant whether Pearson has offered evidence of Macines's *overall* track record. Because Macines had a worse record of *tardiness* than Pearson but was treated more favorably under Illinois Bell's supposedly uniform system of attendance expectations, the evidence regarding Macines raises a triable issue whether, but for discrimination, Pearson would not have accumulated as many attendance violations as he did. That in turn means a reasonable jury could conclude that, but for discrimination, the last straw that led to his firing would not have been a last straw had he not been African-American. *See Ortiz*, 834 F.3d at 764 (instructing district courts to focus on the "sole question that matters: Whether a reasonable juror could conclude that [the plaintiff] would have kept his job if he had a different ethnicity, and everything else had remained the same"). Given this conclusion, there is no need to decide whether Braun, Fleck, Galinski, and Bata are proper comparators.

There is also evidence from which a reasonable jury could conclude that Wiley was the key actor behind the discipline that Pearson received. At least once when suspending Pearson, Jackson said it was "over [her] head" and pointed to Wiley's office. Doc. 66 at ¶ 26. Hicks said the same when denying Pearson's requests to cover attendance violations by using a vacation day. Doc 63-1 at 16, pp. 187-88; Doc. 66 at ¶ 32. And Payne testified that discipline on which he, Pearson, and Hicks agreed would change the next day, from which he drew the reasonable inference that Wiley was actively involved in determining Pearson's discipline behind the scenes and wielded his authority to treat Pearson more harshly than the first-level supervisors were otherwise inclined. Doc. 63-3 at 10-11. A reasonable jury could draw the same inference.

With Pearson having established a *prima facie* case, the burden shifts to Defendants to put forward a race-neutral justification for firing him. *See Coleman*, 667 F.3d at 845. Defendants have done so by adducing evidence that Pearson's attendance problems were too

much to bear, that they adhered to the progressive discipline policy, and that he was shown leniency but nevertheless had simply "run out of second chances."  Doc. 52 at 12-13.  The question, then, becomes whether Pearson has adduced sufficient evidence for a reasonable jury to conclude that Defendants' explanation is pretextual.  *See Coleman*, 667 F.3d at 852-53. Importantly, Defendants do *not* argue that they singled out Pearson or treated him unfairly for reasons apart from his race; their race-neutral justification is that he was not treated unfairly at all.  Doc. 52 at 12-13.  Accordingly, Pearson need only cast doubt on whether he was treated evenhandedly in order to raise a legitimate question of pretext at this final step of the *McDonnell Douglas* analysis.  *See Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 379 (7th Cir. 2000) ("[T]he pretext analysis necessarily focuses on the reason provided.").

The primary evidence weighing toward finding pretext is the comparator evidence already discussed, which "can do 'double-duty' at both the prima facie and pretext stages." *Coleman*, 667 F.3d at 858; *see also Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001).  That is because "evidence of selective enforcement of a rule calls into question the veracity of the employer's explanation."  *Coleman*, 667 F.3d at 857 (internal quotation marks omitted).  That said, comparator evidence *alone* does not necessarily suffice to establish pretext. *See id.* at 859 (considering comparator evidence "[t]ogether with" other evidence to establish pretext); *Gordon*, 246 F.3d at 878 (holding that comparator evidence "further emphasized" pretext established on other grounds).

Here, the fact that Pearson experienced other unusually strict treatment reinforces the suspicion that he was in fact being singled out, not treated evenhandedly.  Even if Pearson does not allege that Defendants' non-attendance-related differential treatment of him was itself actionably discriminatory or contributed to his firing, Doc. 61 at 13, it nevertheless is further

evidence—on which a reasonable jury might (or might not) place weight—casting doubt on management's race-neutral justification that it was merely calling balls and strikes against Pearson under a uniform system of workplace expectations.  A reasonable jury also could credit Christ's testimony that Wiley previously singled out another African-American, Akers, whom Wiley perceived as "lazy" (inaccurately, in Christ's view) for harsh disciplinary enforcement, and from that infer that race played a role.

It of course is entirely possible that a reasonable jury could find that Defendants' decisions about when, whether, and how to discipline Pearson were made in good faith, or at least for non-racial reasons.  Specifically, a jury could conclude, as Defendants put it, that Pearson received "multiple opportunities to correct his behavior by repeating steps in the progressive discipline process," which would be "bizarre … if termination were their surreptitious end goal."  Doc. 52 at 13.  After all, Pearson had already received a "first" written warning when he began to be disciplined for tardiness, and his tardies triggered only additional "first" warnings; he did not progress to a "second" warning (and accompanying one-day suspension) until he was again altogether absent from work for two days.  Doc. 62 at ¶¶ 29-33.

Although a reasonable jury could reach that conclusion, the evidence would allow it to conclude that Defendants' tardiness concerns were pretext for race discrimination.  Pearson has therefore carried both his burdens under the *McDonnell Douglas* framework.  And because Pearson survives summary judgment under *McDonnell Douglas*, there is no need under *Ortiz* to examine more broadly whether the record would allow a reasonable jury to find that his race caused his termination.

## Conclusion

For the foregoing reasons, the Defendants' summary judgment motion is denied. This case will proceed to trial on February 23, 2016.

December 20, 2016

_____
United States District Judge